# UNITED STATES DISTRICT COURT

# DISTRICT OF MINNESOTA

| | |
|---|---|
| CAMBRIA COMPANY, LLC,<br>　　　　　　　　　　　　Plaintiff,<br><br>v.<br><br>PENTAL GRANITE & MARBLE, INC.<br>and VINACONEX ADVANCED<br>COMPOUND STONE JOINT STOCK<br>COMPANY,<br>　　　　　　　　　　　　Defendants. | Civil No. 12-228 (JRT/AJB)<br><br><br>**MEMORANDUM OPINION AND<br>ORDER** |

　　　　Ann N. Cathcart Chaplin and Rebecca L. Shult, **FISH & RICHARDSON PC**, 60 South Sixth Street, Suite 3200, Minneapolis, MN 55402, for plaintiff.[1]

　　　　Anthony J. Alt and Jeffrey M. Thompson, **MEAGHER & GEER, PLLP**, 33 South 6th Street, Suite 4400, Minneapolis, MN 55402, for defendant Pental Granite & Marble, Inc.


　　　　Cambria Company LLC's ("Cambria") brings this action against Pental Granite & Marble, Inc. ("Pental") and Vinaconex Advanced Compound Stone Joint Stock Company ("Vicostone") asserting copyright infringement, violation of the Minnesota Uniform Deceptive Trade Practices Act, unfair competition, and unjust enrichment. The Court will address two motions raised by Pental.

---

[1] At the hearing, plaintiff was represented by Erin O. Dungan and Michael M. Lafeber, Briggs & Morgan, PA, 80 South 8th Street, Suite 2200, Minneapolis, MN 55402. On January 22, 2013, a Notice of Withdrawal as Attorney and Substitution of Counsel was filed.

First, Pental moves to dismiss this action based on a lack of personal jurisdiction. The Court will deny Pental's motion because this Court has specific jurisdiction over Pental. Pental also moves that the entry of default against Vicostone be set aside for good cause under Federal Rule of Civil Procedure 55(c). The Court will set aside the entry of default because it appears that no signature was obtained at the time of service from Vicostone's authorized representative. The Court will first address Cambria's motion to dismiss and then address its motion to set aside the entry of default.

## BACKGROUND

### I. PARTIES

Cambria is a Minnesota company with its place of business in Le Sueur, Minnesota. (Am. Compl. ¶ 3, Feb. 16, 2012, Docket No. 3; Decl. of Peter Martin ¶ 1, Feb. 28, 2013, Docket No. 97.) Cambria manufactures its product samples at its production facility in Le Sueur, Minnesota. (Martin Decl. ¶ 2.) Cambria's website is operated by Cambria from an office in Eden Prairie, Minnesota. (*Id.* ¶ 3.) Cambria designs, manufactures, markets, and sells natural quartz surfacing products, including countertops. (Am. Compl. ¶¶ 6, 10.)

Pental is a Washington corporation with its principal place of business in the State of Washington. (Aff. of Parminder Singh Pental ¶ 2, Mar. 13, 2012, Docket No. 8.) Pental is a wholesale tile and stone distributor with three showrooms in Washington and Oregon. (*Id.* ¶ 3.) Its products consist of tile and slabs made of natural stone, ceramic, glass, metal, porcelain, terrazzo, and quartz. (*Id.* ¶ 4.)

Vicostone is a Vietnamese corporation and the manufacturer of certain of Pental's products. (Second Decl. of Parminder Singh Pental ¶ 4, May 8, 2012, Docket No. 29.)

## II. BASIS FOR CLAIMS

Cambria has copyright registrations for three of its natural quartz surfacing products: Canterbury Quartz Material Design, Lincolnshire Quartz Material Design, and Windermere Quartz Material Design (collectively, "Cambria's Copyrighted Designs"). (Am. Compl. ¶¶ 7, 9.) Cambria alleges that Pental has engaged in unlawful conduct by "copying, duplication, manufacturing, marketing, distribution, offer for sale, and sale of infringing copies or derivative works of Cambria's Copyrighted Designs." (*Id.* ¶¶ 14, 21.) Specifically, Cambria alleges that Pental has infringed on Cambria's Copyrighted Designs through "at least" the following product designations: BQ 9310 Cappuccino ("Cappuccino"), BQ 9330 Toffee ("Toffee"), and BQ 9340 Garnet ("Garnet"). (*Id.* ¶ 14.) These products are marketed and sold under the "Chroma Quartz by Pental" name.[2]

Cambria includes information about its products on its website. The website states that it is operated by Cambria from its place of business within Minnesota and that "[t]hose who choose to access this website from other locations do so on their own initiative and are responsible for compliance with applicable local laws." (Decl. of Ann N. Cathcart Chaplin, Ex. 2, Feb. 28, 2013, Docket No. 96.) It further states, "Any claims relating to the information available on this website will be governed by the laws

---

[2] Vicostone manufactures Pental's Cappuccino, Toffee, and Garnet products, as well as all other Chroma Quartz by Pental products. (Second Pental Decl. ¶ 4.)

of the State of Minnesota, U.S.A., excluding the application of its conflicts of law rules." (*Id.*)

Pental purchased samples of Cambria's products from Cambria's website. (Chaplin Decl., Ex. 1 at 6.) Specifically, Pental purchased samples from Cambria on December 2, 2009, November 28, 2011, July 26, 2011, December 30, 2011, and December 5, 2012. (*Id.*)[3]

Cambria alleges that Pental published a list of "Chroma Crossover Names" that indicate which of Pental's products are like Cambria's Copyrighted Designs and which are "substantially similar" to Cambria's Copyrighted Designs. (Am. Compl. ¶ 16; *see also* Decl. of Erin O. Dungan, Ex. B, Apr. 3, 2012, Docket No. 16.) The complaint does not allege that such a list was published in Minnesota or sent to Minnesota customers. Cambria sent a cease and desist letter to Pental related to its allegedly infringing actions, but Pental did not "acknowledge Cambria's rights" or "cease its activities." (Am. Compl. ¶ 22.)

## III.    PENTAL'S CONTACTS WITH MINNESOTA

### A.    Sales

Pental claims that it has neither sold its Cappuccino, Toffee, or Garnet products in Minnesota nor shipped such products to Minnesota. (Pental Aff. ¶ 5; Aff. of Gerald Bailey ¶ 4, Mar. 13, 2012, Docket No. 9.) Pental further states that it has never sent any

---

[3] These samples included purchases of Cambria's Copyrighted Designs on December 5, 2012, after this action was filed. (Chaplin Decl., Ex. 1 at 6.)

correspondence to a Minnesota customer regarding its Chroma Quartz by Pental products. (Pental Aff. ¶ 8.)

Pental has never had any licenses, addresses, property, bank accounts, employees, agents, or telephone numbers in Minnesota. (*Id.* ¶ 10.) In addition, Pental has not operated any stores or rented any property in Minnesota. (*Id.* ¶ 11.) Its employees also have not traveled to Minnesota for business purposes. (*Id.* ¶¶ 13-14.)

Pental has sold some its products to Minnesota customers, however, primarily porcelain tile. (Bailey Aff. ¶¶ 2-3.) Specifically, according to Pental, in 2008, it had zero Minnesota sales amounting to $0 (of Pental's $45,606,680 total company sales); in 2009, five sales amounting to $22,595 (of $32,926,366 total); in 2010, one sale for $8,181 (of $32,473,176 total); in 2011, eight sales amounting to $16,890 (of $30,343,177 total); and in 2012 (January 1, 2012 - February 29, 2012), zero sales amounting to $0 (of $4,783,920). (*Id.* ¶¶ 2, 5.) Thus, there have been fourteen Minnesota sales for a total of approximately $47,000 in over four years (of approximately $146 million in total company sales). (*Id.* ¶¶ 2, 5.) This $47,000 worth of products was sold directly by Pental and not through its distributor, Damar. (Letter to District Judge, May 31, 2012, Docket No. 45.)

## B. Website

Pental operates a website, www.pentalonline.com, available to anyone with access to the Internet. (Aff. of Emmanuel Corral ¶ 2, Mar. 13, 2012, Docket No. 10.) The website provides information about Pental and Pental's products, including the allegedly

infringing products.  (Pental Aff. ¶ 19; Dungan Decl., Ex. D.)  The website indicates that the allegedly infringing products are available in Minnesota through Pental's distributor, Damar.  (Dungan Decl., Ex. D.)

A person accessing the site can send an e-mail inquiry to Pental through a hyperlink.  (Corral Aff. ¶ 3.)  Visitors to the website can also subscribe to comments and entries and post comments.  (*Id.* ¶ 6.)

Pental's website does not provide sales forms but includes product prices.  (First Decl. of Parminder Singh Pental ¶ 7, Apr. 17, 2012, Docket No. 18.)  A person cannot place an order over the website.  (Bailey Aff. ¶ 6; Corral Aff. ¶ 5.)  No sales can be or have been made through the website, and no contracts are entered over the website.  (Bailey Aff. ¶ 7; Pental Aff. ¶ 20.)  A customer with an appropriate account may pay a bill through the website, however.  (Corral Aff. ¶ 4.)

Pental claims that no e-mails sent by means of the e-mail hyperlink on the website have constituted an order from a Minnesota customer.  (Bailey Aff. ¶ 8.)  Pental also claims that no Minnesota customer has paid a bill on Pental's website.  (*Id.* ¶ 9.)  In addition, Pental asserts that its replies to comments on the website have not related to Minnesota sales.  (Corral Aff. ¶ 7.)

Individuals accessing Pental's website can also link to the company's Facebook or Twitter page.  (*Id.* ¶ 8.)  Pental claims that the Facebook and Twitter pages are for informational purposes about the company.  (Pental Aff. ¶ 19.)  A person cannot place an order over the Facebook or Twitter pages.  (Bailey Aff. ¶ 6; Corral Aff. ¶ 9.)  Pental does

not enter into contracts or make any sales over its Facebook page or Twitter. (Pental Aff. ¶ 20.)

Internet users can "follow" Pental through Twitter or can "like" posts on Pental's Facebook page. (*See* Dungan Decl. ¶ 3.) Two entities located in Minnesota are "following" Pental on Twitter. These two entities are Mercury Mosaics and Sheepish Designs. (*Id.*, Exs. M-P.) Mercury Mosaics sells unique handmade tile, not the quartz products at issue. (*See id.*, Ex. N; Aff. of Jeffrey M. Thompson, Ex. 1, Apr. 17, 2012, Docket No. 20.) Sheepish Designs is a web-design and digital media group. (Dungan Decl., Exs. O-P.)

A Minnesota entity, Granite City Tool, and one of its employees have "liked" posts on Pental's Facebook page twelve times. (*Id.* ¶ 3, Exs. Q, S-CC.) Granite City Tool sells diamond blades and accessories for stone products. (*See* Thompson Aff., Ex. 2.) Pental argues that Granite City Tool is a vendor apparently trying to sell its own stone-cutting tools and accessories.

### C. Magazine

Pental places advertisements in the Alaska Airlines in-flight magazine and National Kitchen & Bath Association's Magazine. (Dungan Decl., Ex. C at 5.) Alaska Airlines services the Minneapolis-St. Paul airport. (*Id.*, Exs. G, H.) National Kitchen & Bath Association's Magazine is distributed to at least 184 members in Minnesota. (*Id.* ¶ 2, Exs. I, J.)

## D. Damar

Pental has an unwritten informal agreement with Chicago-based distributor Damar to sell certain products in the Midwest, including Minnesota. (Pental Aff. ¶¶ 15-16.) Pental's website lists Damar as a distributor for Minnesota. (Dungan Decl., Ex. D.)

When a Minnesota customer orders a Pental product from Damar, Damar then purchases the product by ordering it from Pental. (*See* Decl. of Gerald Bailey ¶¶ 2-3, Apr. 17, 2012, Docket No. 19.) Despite Pental's claim that it "does not receive reports or information regarding the location of Damar's customers" (Pental Aff. ¶ 17), it appears that, in at least some cases, Pental does have knowledge of the intended destination of the products it ships. (*See* Bailey Decl. ¶ 2 (discussing an order in which Damar purchased and "Pental sold a total of three Chroma slabs that were intended for Minnesota").)

The record is largely silent regarding Damar's marketing and advertising of Pental's products, including the allegedly infringing products. It appears that Damar ordered three Chroma slabs for sale to a Minnesota consumer, although the slabs were not the three specifically-mentioned infringing products. (*See id.* ¶ 2.) It is unclear if Damar sold more Pental products in Minnesota, although it appears likely that Damar did so because it attempts to sell Pental's products in the state.

Pental claims that it exercises no control over Damar's selling activities and does not receive reports or information regarding the location of Damar's customers. (First Pental Aff. ¶ 17.) Pental further asserts that it does not control Damar's marketing activities. (Pental Decl. ¶ 5.)

However, the president of Pental submitted an affidavit which stated, "I have confirmed with Ron Allan at Damar, who, to my knowledge, is Damar's General Manager, that Damar has not sold the Cappuccino, Toffee, or Garnet products in Minnesota, nor to Minnesota customers, and Damar **has agreed** not to sell such products to Minnesota customers while we resolve this matter." (Pental Aff. ¶ 18 (emphasis added).)[4]

## IV. SERVICE ON VICOSTONE

The Court will now outline facts relevant to Pental's motion to vacate the entry of default. On May 4, 2012, Cambria submitted an affidavit to the Court claiming to have served Vicostone in this matter. (Appl. for Entry of Default, May 4, 2012, Docket No. 23.) The clerk entered a default of record that same day. (Clerk's Entry of Default, May 4, 2012, Docket No. 25.)

The default was entered based upon the declaration of attorney Michael M. Lafeber. (Decl. of Michael M. Lafeber, May 4, 2012, Docket No 24.) The declaration stated:

---

[4] Cambria argues this agreement shows that Pental exercises control over Damar because Damar agreed not to sell these products in Minnesota while this action is pending. As further support for Pental's control over its distributor Damar, Cambria points out that Pental stated in another lawsuit that it had approached a Southern-California distributor (Stoneville) because it was looking for a distributor in the Southern-California market. (Dungan Decl., Ex. C at 4.) Pental claimed that it did "not monitor the independent distributor[] [Stoneville's]" decisions about where to market or sell. (*Id.*) After a lawsuit was filed, however, Stoneville likewise stopped selling the product at issue in that suit. (Dungan Decl., Ex. E at 2.) Pental responds that Damar's decision not to sell the three products in Minnesota reflected Damar's business decision, not some type of control on Pental's part over Damar's selling activities.

> 2.     To the best of my knowledge, information and belief, Defendant
>         Vinaconex Advanced Compound Stone Joint Stock Company
>         ("Vinaconex") is a Vietnamese corporation with its principal place
>         of business at Vinaconex Building, Trung Hoa – Nhan Chinh Urban
>         Zone, Thanh Xuan District, Hanoi, Vietnam.
>
> 3.     Vinaconex was duly served with the Summons and First Amended
>         Complaint on March 15, 2012.  A copy of the Affidavit of Service
>         on Vinaconex is attached hereto as Exhibit A.
>
> 4.     As of the present date, Vinaconex has failed to appear, answer or
>         otherwise respond to or defend this action within twenty-one days of
>         service as required by the Federal Rules of Civil Procedure.

(*Id.*)

The declaration attached a proof of service document, filled out by a process server named Sim Mala on March 29, 2012.  (*Id.*, Ex. A.)  Mala claimed to have served the summons on March 15, 2012, on "Duong Trung (Security Guard who denied access), who is designated by law to accept service of process on behalf of Vinaconex Advanced Compound Stone Joint Stock Company."  (*Id.*)  More specifically, the proof of service document stated:

> Service was made on Vinaconex Advanced Compound Stone Joint Stock
> Company by handing the documents to Duong Trung (Security Guard who
> denied me access and who advised me that company policy does not allow
> for personal service on any Officer or staff).   Service was made on
> March 15, 2012, at 1:10 p.m. at the corporate address of Defendant of
> Vinaconex Building, Trung Hoa – Nhan Chinh Urban Zone, Thanh Xuan
> District, Hanoi, Vietnam.  Copies of the same documents were mailed to
> the Defendant on 03/15/2012.  Documents served: Summons and First
> Amended Complaint.

(*Id.*)  Cambria attached no signed receipts from either the guard who was served or any entity receiving the mail to Vicostone's address.  (*See id.*)

**ANALYSIS**

# I. JURISDICTION

## A. Standard of Review

The Court will first address Pental's motion to dismiss this action based on lack of personal jurisdiction. A plaintiff must allege sufficient facts in the complaint supporting a reasonable inference that the court can exercise personal jurisdiction over the defendant. *Wells Dairy, Inc. v. Food Movers Int'l, Inc.*, 607 F.3d 515, 518 (8th Cir. 2010). The plaintiff has the burden of proving facts to support personal jurisdiction once it has been challenged. *Id.* The court resolves factual conflicts in the non-moving party's favor. *K-V Pharm. Co. v. J. Uriach & CIA, S.A.*, 648 F.3d 588, 592 (8th Cir. 2011).

"Because Minnesota's long-arm statute is 'coextensive with the limits of due process,' the only question is whether the exercise of personal jurisdiction comports with due process." *CBS Interactive Inc. v. Nat'l Football League Players Ass'n, Inc.*, 259 F.R.D. 398, 404 (D. Minn. 2009) (quoting *Minn. Mining & Mfg. Co. v. Nippon Carbide Indus., Inc.*, 63 F.3d 694, 697 (8th Cir. 1995)). Due process requires "minimum contacts" with the forum state. *Burlington Indus., Inc. v. Maples Indus., Inc.*, 97 F.3d 1100, 1102 (8th Cir. 1996). "The central question" in determining whether Pental has sufficient minimum contacts with Minnesota "is whether [it] has purposefully availed itself of the privilege of conducting activities in the forum state and should, therefore, reasonably anticipate being haled into court there." *Pecoraro v. Sky Ranch for Boys, Inc.*, 340 F.3d 558, 562 (8th Cir. 2003).

The Eighth Circuit has established

a five-factor test . . . to determine the sufficiency of defendant's contacts . . . (1) the nature and quality of contacts with the forum state; (2) the quantity of such contacts; (3) the relation of the cause of action to the contacts; (4) the interest of the forum state in providing a forum for its residents; and (5) convenience of the parties.

*Burlington Indus.*, 97 F.3d at 1102. The first three factors are "of primary importance," and the Court may consider them together. *Id.*; *Digi-Tel Holdings, Inc. v. Proteq Telecomms. (PTE), Ltd.*, 89 F.3d 519, 523 (8th Cir. 1996).

### B.  Nature, Quality, and Quantity of Contacts

When looking to the nature and quality of contacts, the central question is "whether the defendant had fair warning of being sued in Minnesota.  The defendant had fair warning if it purposefully directed its activities at residents of this state." *W. Publ'g Corp. v. Stanley*, Civ. No. 03-5832, 2004 WL 73590, at *5 (D. Minn. Jan. 7, 2004) (internal quotation marks omitted).  The quantity of contacts is relevant but not necessarily determinative where specific jurisdiction has been alleged. *See id.* at *4; *Marine Innovations Warranty Corp. v. Am. Marine Holdings, Inc.*, Civ. No. 03-4646, 2004 WL 234398, at *3 (D. Minn. Feb. 4, 2004).

### 1.  Website Contacts

One source of Pental's contacts is its website.  The Eighth Circuit applies the "sliding scale" test outlined in *Zippo Mfg. Co. v. Zippo Dot Com, Inc.*, 952 F. Supp. 1119, 1124 (W.D. Pa. 1997) to contacts made over a website, *see Lakin v. Prudential Secs.*,

*Inc.*, 348 F.3d 704, 710–11 (8th Cir. 2003), and classifies these contacts according to the following criteria:

> At one end of the spectrum are situations where a defendant clearly does business over the Internet. If the defendant enters into contracts with residents of a foreign jurisdiction that involve the knowing and repeated transmission of computer files over the Internet, personal jurisdiction is proper. At the opposite end are situations where a defendant has simply posted information on an Internet Web site which is accessible to users in foreign jurisdictions. A passive Web site that does little more than make information available to those who are interested in it is not grounds for the exercise [of] personal jurisdiction. The middle ground is occupied by interactive Web sites where a user can exchange information with the host computer. In these cases, the exercise of jurisdiction is determined by examining the level of interactivity and commercial nature of the exchange of information that occurs on the Web site.

*Zippo*, 952 F. Supp. at 1124 (citations omitted).

Here, the Court finds that Pental's website, and its linked information to Pental's Twitter and Facebook pages, constitutes a "middle ground" website on the *Zippo* scale. *See id.*; *Lakin*, 348 F.3d at 712. Although visitors to Pental's website cannot order Pental's products over the site, they can pay a bill, fill out an e-mail inquiry by way of a hyperlink, and learn of locations where customers, including Minnesota customers, can purchase Pental's products. Users can also "like" or "follow" Pental on the sites linked to its website and can leave comments about or to Pental. Pental's website thus allows user to "exchange information with the host computer" and is a middle ground website. *See Zippo*, 952 F. Supp. at 1124; *VData, LLC v. Aetna, Inc.*, Civ. No. 06-1701, 2006 WL 3392889, at *12-13 (D. Minn. Nov. 21, 2006).

Pental's website has led to contacts with Minnesota residents. *See Lakin*, 348 F.3d at 711-12 (considering quantity of contacts). Minnesota residents, including Mercury

Mosaics, Sheepish Designs, and Granite City Tool, have accessed and interacted with Pental's website. The Court also finds it highly likely that the sales conducted by Pental to Minnesota consumers were related to Pental's website, and Pental has not denied this fact.[5] Because Pental's website specifically attempts to and does attract Minnesota residents, because it advertises the allegedly infringing products, and because of its interactive features, the Court finds that this website – in conjunction with the other factors discussed below – supports a finding of jurisdiction.

### 2. Other Contacts

In addition to its website, Pental had contacts with Minnesota through its sales and its advertisements. As noted above, Pental has sold approximately $47,000 of products in Minnesota, totaling fourteen Minnesota sales.[6] Pental also advertised in Alaska Airlines' in-flight magazine and National Kitchen & Bath Association's Magazine, publications

---

[5] Pental states that no e-mails sent by means of the e-mail hyperlink on the website have constituted an order from a Minnesota customer. It has not asserted, however, that its website has not led to sales to Minnesota residents. Given that Pental is located in the state of Washington, the Court finds it highly likely that at least some of its sales directly to Minnesota consumers were facilitated by its website. Furthermore, as will be discussed below, the Court finds that its website likely contributed to Minnesota sales through Damar.

[6] Although this consideration is not critical to the Court's decision, the Court notes that it appears likely that Damar sold additional Pental products in Minnesota. Pental appears to have control over Damar, allowing Damar's sales to be considered as contacts attributable to Pental. *See Guinness Imp. Co. v. Mark VII Distribs., Inc.*, 153 F.3d 607, 615 (8th Cir. 1998); *Digi-Tel Holdings, Inc.*, 89 F.3d at 524-25. Furthermore, Pental had more than a mere expectation that products would be sold in Minnesota through Damar; Pental affirmatively marketed that its products were available in Minnesota through Damar. *See Vitullo v. Velocity Powerboats, Inc.*, No. 97-C-8745, 1998 WL 246152, at *7 (N.D. Ill. Apr. 27, 1998) (finding jurisdiction where a defendant's webpage explicitly solicited residents of a state to attend a boat show and see its boats sold by an independent dealer).

that reached Minnesota consumers.  *See Roth Grading, Inc. v. Stephens MDS*, No. 8:06CV724, 2007 WL 1291149, at *3 (D. Neb. Mar. 20, 2007) ("[F]requent communications, when taken together with some other action directed toward the forum state, may help establish sufficient minimum contacts.").[7]  These contacts had an impact on Minnesota citizens, providing a fair warning that Pental might be subject to Minnesota courts.  Furthermore, Pental admits that it purchased goods from Cambria through Cambria's website, which specifically references that Cambria is from Minnesota and that website users are subject to Minnesota law.  Based on the totality of circumstances, the Court finds that the first two factors of the Eighth Circuit's jurisdictional test weigh in favor of finding jurisdiction.

## C.    Relation of Cause of Action to Contacts

The Court will next consider the third factor, the relation of the cause of action to the contacts.  "Personal jurisdiction may be established by general jurisdiction or specific jurisdiction, and the third factor – relation of the cause of action to the contacts – distinguishes between the two."  *Wells Dairy, Inc.*, 607 F.3d at 518.  "Specific

---

[7] Pental claims that it has not had an advertisement published in Alaska Airlines' Magazine since November 2010, and in National Kitchen & Bath Association's Magazine since April 2011.  (First Pental Decl. ¶¶ 3-4.)  Pental further claims that it did not begin selling any of the allegedly infringing products until October 2011, (*id.* ¶ 2), well after such advertisements were run.  The Court finds that, nonetheless, it can consider these advertisements because they occurred within a reasonable period of time of the filing of this action and the arising of the cause of action.  *See Pecoraro*, 340 F.3d at 562 (citing *Clune v. Alimak AB*, 233 F.3d 538, 544 n.8 (8th Cir. 2000)); *Metro. Life Ins. Co. v. Robertson-Ceco Corp.*, 84 F.3d 560, 569 (2d Cir. 1996); *see also Foster v. Trollhaugen, Inc.*, Civ. No. 06-2983, 2007 WL 1219304, at *3-4 (D. Minn. Apr. 26, 2007).

jurisdiction refers to jurisdiction over causes of action arising from or related to a defendant's actions within the forum state while general jurisdiction refers to the power of a state to adjudicate any cause of action involving a particular defendant regardless of where the cause of action arose." *Digi-Tel Holdings, Inc.*, 89 F.3d at 523 n.4. Specific personal jurisdiction is proper "only if the injury giving rise to the lawsuit occurred within or had some connection to the forum state, meaning that the defendant purposely directed its activities at the forum state and the claim arose out of or relates to those activities." *Steinbuch v. Cutler*, 518 F.3d 580, 586 (8th Cir. 2008).

The Court finds that specific jurisdiction exists because the causes of action arose out of or are related to Pental's contacts with Minnesota.[8] Pental advertised its Chroma products and specifically stated that such products were available in Minnesota, thereby directing them at Minnesota residents. "It is logical to say that a 'national advertisement' available to all persons with access to the Internet may take on a 'local' characteristic when it expressly solicits local residents[.]" *Vitullo v. Velocity Powerboats, Inc.*, No. 97-C-8745, 1998 WL 246152, at *7 (N.D. Ill. Apr. 27, 1998).[9] The fact that Pental's middle

---

[8] The Court will not consider whether there is general jurisdiction because it has found specific jurisdiction.

[9] *See also Neogen Corp. v. Neo Gen Screening, Inc.*, 282 F.3d 883, 891 (6th Cir. 2002) ("Another aspect of the website that supports purposeful availment, even if passive, is the fact that [defendant] holds itself out as welcoming [forum state] business."); *3M Co. v. Icuiti Corp.*, Civ. No. 05-2945, 2006 WL 1579816, at *2 (D. Minn. June 1, 2006) (finding jurisdiction by considering, among other facts, a website's listing of Minnesota as a shipping destination); *Multi-Tech Sys., Inc. v. VocalTec Commc'ns, Inc.*, 122 F. Supp. 2d 1046, 1051 (D. Minn. 2000) (finding jurisdiction by considering, among other facts, that defendant "purposely availed itself

(Footnote continued on next page.)

ground website lists Minnesota as a destination for Pental's products, including the allegedly infringing products, weighs strongly in favor of finding purposeful availment of this forum. These contacts are related to Cambria's causes of action because Cambria has alleged copyright infringement of these very products. The Court concludes, therefore, that the injury giving rise to the lawsuit had a sufficient connection with the forum state to establish jurisdiction. *See Steinbuch*, 518 F.3d at 586.

Pental argues that there is no jurisdiction because neither it nor Damar has sold the allegedly infringing products in Minnesota. However, this fact is not controlling. *See, e.g.*, *Safco Prods. Co. v. WelCom Prods., Inc.*, 730 F. Supp. 2d 959, 965 (D. Minn. 2010) (finding that sales and attempted sales can satisfy minimum contacts). In *B.F. Goodrich Co. v. Auxitrol S.A.*, the Court found jurisdiction over the defendant company that had not sold the infringing product in Minnesota. Civ. No. 00-43, 2001 WL 1640103, at *4-5 (D. Minn. Nov. 30, 2001). The Court found jurisdiction based on a variety of factors, including that the defendant company intended to sell the product in Minnesota in the future but simply had not done so, that the defendant advertised with Northwest Airlines, and the defendant knew that its actions would affect a Minnesota company. *Id.* at *5. Similarly, in *Mulcahy v. Cheetah Learning, LLC*, a defendant company was subject to specific jurisdiction because it sold seats to a test preparation course in Minnesota, even

_____

(Footnote continued.)

for engagement in commercial activities with residents of Minnesota by including a state directory drop box listing Minnesota" on defendant's website).

though it later cancelled the course, because the selling of the seats established meaningful contacts and relations to Minnesota. Civ. No. 02-791, 2002 WL 31053211, at *3-4 (D. Minn. Sept. 4, 2002). Similarly, here proof of the ultimate sale of an infringing product in Minnesota is not required for the purposes of specific jurisdiction. Although Pental may not have ultimately succeeded in selling these products, it attempted to do so. This attempted sale is sufficient to establish specific jurisdiction. *See, e.g.*, *B.F. Goodrich Co.*, 2001 WL 1640103, at *4-5.

The Court also finds that "stream of commerce" specific jurisdiction exists in this case. The Eighth Circuit has recognized specific jurisdiction involving a nonforum manufacturer that "'pours its products' into a regional distributor with the expectation that the distributor will penetrate a discrete, multi-State trade area." *Vandelune v. 4B Elevator Components Unlimited*, 148 F.3d 943, 948 (8th Cir. 1998) (quoting *Barone v. Rich Bros. Interstate Display Fireworks Co.*, 25 F.3d 610, 615 (8th Cir. 1994)). It appears that Pental has attempted to pour its products, including the products at issue, into Minnesota through Damar and even advertised the products' availability through Damar on the Pental website. These acts suggest that Pental purposely availed itself of this forum in an attempt to sell its allegedly infringing products.[10]

---

[10] Pental argues that this theory is unavailable in lawsuits between merchants, citing *Guinness*, 153 F.3d at 615 n.7 and *Clune v. Alimak AB*, 233 F.3d 538, 545 n.9 (8th Cir. 2000). In the cases cited by Pental, the Eighth Circuit declined to apply the stream of commerce theory based on the merits, and also mentioned that the cases involved two merchants. However, no Eighth Circuit case cited by Pental has said that this form of jurisdiction is unavailable in lawsuits between merchants. The Court finds no reason why, in this context, stream of commerce jurisdiction would be unavailable. In this case, the merits of this type of jurisdiction

(Footnote continued on next page.)

### D. Interest of Forum State and Convenience of Parties

The Court must finally consider the last two factors relevant to its jurisdictional analysis: the interest of the state in providing a forum for residents and the convenience of the parties. *See Digi-Tel Holdings, Inc.*, 89 F.3d at 523. These factors are less important to the Court's jurisdictional analysis than the first three factors. *Stanton v. St. Jude Med., Inc.*, 340 F.3d 690, 694 (8th Cir. 2003).

Minnesota has a strong interest in providing a forum for its residents, so this factor weighs in favor of Cambria. *See Multi-Tech Sys., Inc. v. VocalTec Commc'ns, Inc.*, 122 F. Supp. 2d 1046, 1052 (D. Minn. 2000). Cambria has a strong interest in litigating here, as well. *See id.* Pental has an interest in litigating in its home state, although this is tempered somewhat by the fact that its witnesses from Vietnam and Italy would need to travel regardless of the forum state. (*See* Pental Aff. ¶ 21.) Ultimately, these final two factors – weighed as a whole – tip in favor of finding jurisdiction. Considering the five-factor jurisdictional test, then, the Court finds that jurisdiction exists.[11]

_____

(Footnote continued.)

are met, and Pental has provided no authority that in such a case, even between two merchants, the stream of commerce theory should not apply.

[11] The "effects test," an additional factor to consider when evaluating a defendant's relevant contacts with the forum state, also supports a finding of personal jurisdiction. The "effects test" provides that a defendant's tortious acts weigh in favor of finding jurisdiction "where the plaintiff makes a prima facie showing that the defendant's acts (1) were intentional, (2) were uniquely or expressly aimed at the forum state, and (3) caused harm, the brunt of which was suffered – and which the defendant knew was likely to be suffered – in the forum state." *Johnson v. Arden*, 614 F.3d 785, 796 (8th Cir. 2010) (internal quotations and alterations omitted). The Eighth Circuit has held that an act must be "expressly aimed at the forum state" to satisfy the

(Footnote continued on next page.)

## II.    DEFAULT

### A.    Standard of Review

The Court must next address Pental's motion requesting that the Court set aside the entry of default.  An entry of default occurs "[w]hen a party against whom a judgment for affirmative relief is sought has failed to plead or otherwise defend, and that failure is shown by affidavit of otherwise."  Fed. R. Civ. P. 55(a).  The Rules allow the clerk to enter the default.  *Id.*  Federal Rule of Civil Procedure 55(c) provides that "[t]he court may set aside an entry of default for good cause."  *See Ackra Direct Mktg. Corp. v. Fingerhut Corp.*, 86 F.3d 852, 855 (8th Cir. 1996).

Cambria alleges that the Court should not consider Pental's motion because Pental lacks standing, as the non-defaulting party, to bring it.  *See Angelo Iafrate Constr., LLC*

_____

(Footnote continued.)

effects test, and that merely aiming the action at a particular person located in a particular state is insufficient to satisfy the "effects test."  *Id.*  Here, Pental did more than simply aim the act at Cambria; Pental knew that Cambria was located in Minnesota, Pental published a list of "Chroma Crossover Names" that might obviously affect Cambria, and Pental allegedly intended to copy the design of Cambria's products and thereby hurt Cambria's ability to sell its products in Minnesota and other states.  *See Dakota Indus., Inc. v. Dakota Sportswear, Inc.*, 946 F.2d 1384, 1391 (8th Cir. 1991); *B.F. Goodrich*, 2001 WL 1640103, at *5 (holding that knowing of a plaintiff's location and acting in disregard of that plaintiff's rights is a factor weighing in favor of jurisdiction).  Pental also appears to have accessed Cambria products via its website, which states that "[a]ny claims relating to the information available on this website will be governed by the laws of the State of Minnesota[.]"  In addition, Cambria's allegation that it sent Pental a cease and desist letter further bolsters its allegation that Pental knew the effects of its actions.  *See Janel Russell Designs, Inc. v. Mendelson & Assocs., Inc*, 114 F. Supp. 2d 856, 862 n.2 (D. Minn. 2000) (finding that evidence of a cease and desist letter "bolsters plaintiff's allegations of intentional infringement" in connection with "effects test" analysis).  The "effects test" thus weighs in favor of finding jurisdiction.

*v. Potashnick Constr., Inc.*, 370 F.3d 715, 722 (8th Cir. 2004). The Court will assume without deciding that Pental does not have standing to bring this motion.

Nonetheless, the Court will address whether it is appropriate to overturn the entry of a default based on improper service.[12] Insufficient service is a proper basis for voiding an entry of default *sua sponte* because it deprives a court of proper jurisdiction. *See Printed Media Servs., Inc. v. Solna Web, Inc.*, 11 F.3d 838, 843 (8th Cir. 1993) ("If a defendant is improperly served, a federal court lacks jurisdiction over the defendant."); *see also In re Worldwide Web Sys., Inc.*, 328 F.3d 1291, 1299 (11th Cir. 2003) ("[I]nsufficient service of process under Rule 60(b)(4) implicates personal jurisdiction and due process concerns. Generally, where service of process is insufficient, the court has no power to render judgment and the judgment is void."). Furthermore, Federal Rule of Civil Procedure 4(m) is an "explicit textual recognition" of the Court's "power to dismiss a case for failure to comply with its rules," *Norsyn, Inc. v. Desai*, 351 F.3d 825, 830 (8th Cir. 2003), including improperly effected service of process, *Murphy Bros., Inc.*

_____

[12] *See Missouri ex rel. De Vault v. Fid. & Cas. Co. of N.Y.*, 107 F.2d 343, 345-46 (8th Cir. 1939) ("The default of a party to an action is always a harsh measure, and no party should ever be defaulted, unless the ground upon which such default is authorized are clearly and authoritatively established and are in such clear and certain terms that the party to be defaulted can know, without question, that he is subject to default if he does not act in a certain manner." (internal quotation marks omitted)); *Wells Fargo Bank v. Hodge*, 939 N.Y.S.2d 98, 99 (N.Y. App. Div. 2012) ("A court has inherent power to vacate a judgment entered upon default for sufficient reason and in the interests of substantial justice." (internal quotation marks omitted)); *see also Devore Assocs., LLC v. Sorkin*, 31 A.3d 420, 424 (Conn. App. Ct. 2011).

*v. Michetti Pipe Stringing, Inc.*, 526 U.S. 344, 350 (1999).[13]  Accordingly, the Court will address the issue of service of process to determine if it has jurisdiction.

### B.      Sufficiency of Service of Process

#### 1.      Standard for Determining Sufficiency

Service of a corporation outside of the United States shall be made "in any manner prescribed by Rule 4(f) for serving an individual, except personal delivery under (f)(2)(C)(i)."  Fed. R. Civ. P. 4(h)(2).  Rule 4(f) provides for service:

> (1)    by any internationally agreed means of service that is reasonably calculated to give notice, such as those authorized by the Hague Convention on the Service Abroad of Judicial and Extrajudicial Documents;

> (2)    if there is no internationally agreed means, or if an international agreement allows but does not specify other means, by a method that is reasonably calculated to give notice:

>> (A)    **as prescribed by the foreign country's law for service in that country in an action in its courts of general jurisdiction;**

>> (B)    as the foreign authority directs in response to a letter rogatory or letter of request; or

>> (C)    unless prohibited by the foreign country's law, by:

>>> (i)    delivering a copy of the summons and of the complaint to the individual personally; or

---

[13] *See Omni Capital Int'l, Ltd. v. Rudolf Wolff & Co.*, 484 U.S. 97, 104 (1987) ("Before a federal court may exercise personal jurisdiction over a defendant, the procedural requirement of service of summons must be satisfied."); *Wolf-Tec, Inc. v. Miller's Sausage Co.*, 899 F.2d 727, 728 (8th Cir. 1990) (holding that default judgment was unenforceable where the court lacked jurisdiction); *Recreational Props., Inc. v. Sw. Mortg. Serv. Corp.*, 804 F.2d 311, 314 (5th Cir. 1986) (stating that if a court lacks jurisdiction over a defendant "because of insufficient service of process, the [default] judgment is void").

           (ii)  using any form of mail that the clerk addresses and sends
                 to the individual and that requires a signed receipt; or

(3)    by other means not prohibited by international agreement, as the
        court orders.

Fed. R. Civ. P. 4(f) (emphasis added). Vietnam is not a signatory to the Hague Convention. *See TracFone Wireless, Inc. v. Bitton*, 278 F.R.D. 687, 691 (S.D. Fla. 2012). Accordingly, "there is no internationally agreed means within the language of 4(f)(2)." *Id.* (internal quotation marks omitted). Service may therefore be made as appropriate under Fed. R. Civ. P. 4(f)(2). *See TracFone Wireless, Inc.*, 278 F.R.D. at 691.

Cambria has not requested the assistance of the Clerk or the Court with service on Vicostone, and it has not proceeded through a letter rogatory or letter request. Accordingly, Cambria may serve Vicostone "by a method that is reasonably calculated to give notice as prescribed by [Vietnam's] law for service in that country in an action in its courts of general jurisdiction." Fed. R. Civ. P. 4(f)(2)(A). The Court must therefore determine if service was properly conducted under Vietnamese law.

To interpret Vietnamese law, the Court applies Federal Rule of Civil Procedure 44.1, which states:

A party who intends to raise an issue about a foreign country's law must give notice by a pleading or other writing. In determining foreign law, the court may consider any relevant material or source, including testimony, whether or not submitted by a party or admissible under the Federal Rules of Evidence. The court's determination must be treated as a ruling on a question of law.

Fed. R. Civ. P. 44.1.  Because Rule 44.1 provides that any relevant material may be considered, the Court may consider written expert testimony.  *Trinidad Foundry & Fabricating, Ltd. v. M/V K.A.S. Camilla*, 966 F.2d 613, 615 (11th Cir. 1992).  Also, an unauthenticated copy of the foreign law is acceptable.  *See Ramirez v. Autobuses Blancos Flecha Roja, S.A. de C.V.*, 486 F.2d 493, 497 n.11 (5th Cir. 1973).

## 2.      Sufficiency of Service Under Vietnamese Law

The Court must look to Vietnamese law to determine whether Cambria's service on Vicostone was proper.  As described above, Cambria's process server mailed the summons and complaint to Vicostone and personally delivered it to the security guard. To show that this service was inadequate, Pental has submitted an unauthenticated copy of Vietnamese law as well as an affidavit from Dr. Nguyen Hoan Thanh, a Vietnamese attorney, reciting provisions of Vietnamese law which suggest that the service of process in this case was improper.  (Decl. of Jeffrey M. Thompson, Exs. 2-6, May 17, 2012, Docket No. 39.)[14]

Persons who may effect service under Chapter X of Vietnamese law include the parties and their representatives, as well as postmen.  (*See id.*, Ex. 3, at ch. X, art. 148.) Modes of service include (1) directly; (2) by post office; (3) by authorized third person; (4) by public posting; and (5) by announcement on mass media.  (*See id.*, Ex. 3 at ch. X, art. 149.)

---

[14] Cambria has not submitted any expert affidavits to show that its service was proper.

Chapter X contains specific requirements for serving corporations, stating:

Where the persons to whom the procedural documents are issued, sent, or notified are agencies or organizations, the procedural documents must be delivered directly to their representatives at law or persons responsible for the receipt thereof, **who must sign the receipts**. Where the agencies or organizations to which the documents are issued, sent or notified have their representatives to receive the procedural documents, such persons shall sign for the receipt thereof. **The date of signing for receipt shall be regarded as the date of issuance, sending or notification.**

(Thompson Decl. Ex. 2, ¶ 6; Ex. 3, ch. X, art. 153 (emphases added).)

By considering the above-described sections of Vietnamese law, the Court finds that Cambria has not satisfied the requirements of Vietnamese law. Most concretely, Cambria has not submitted a signed receipt as required by Chapter X, and it appears based on the evidence that no such receipt was signed.[15] Accordingly, the Court finds good cause to overturn the entry of default and will do so.

## ORDER

Based on the foregoing, and all the files, records, and proceedings herein, **IT IS HEREBY ORDERED** that:

1.      Defendant Pental Granite & Marble, Inc.'s motion to dismiss for lack of jurisdiction [Docket No. 5] is **DENIED**.

---

[15] There are also other reasons for overturning the entry of default. For example, it does not appear that the security guard served was a "representative[] at law or person[] responsible for the receipt thereof" as required by Chapter X. (*See* Thompson Decl., Ex. 3.) Also, it does not appear that mailing the service materials to the corporate headquarters was sufficient to reach a representative at law because there is no indication that an individual was named on the envelope; the proof of service states only that the documents were "mailed to the Defendant."

2.      Defendant Pental Granite & Marble, Inc.'s motion to set aside entry of default against defendant Vinaconex Advanced Compound Stone Joint Stock Company [Docket No. 36] is **GRANTED**.

3.      The Clerk of Court is directed to set aside the entry of default [Docket No. 25] as to Defendant Vinaconex Advanced Compound Stone Joint Stock Company.

DATED:  March 27, 2013                          _____ s/ John R. Tunheim _____
at Minneapolis, Minnesota.                              JOHN R. TUNHEIM
                                                        United States District Judge